**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

JUN 0 5 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Respondent, | §<br>§<br>§ | |
| v. | §<br>§ | Civil No. B-02-095<br>Crim. No. B-00-437 |
| | § | |
| DONALD KEITH KING,<br>Petitioner. | §<br>§<br>§ | |

**GOVERNMENT'S ANSWER TO SECTION 2255 MOTION, MOTION TO
DISMISS, MOTION FOR SUMMARY JUDGMENT, AND BRIEF**

The United States of America ("United States" or "Government"), by and
through the United States Attorney for the Southern District of Texas, hereby files
this Answer to Section 2255 Motion, Motion to Dismiss, Motion for Summary
Judgment, and Brief. Donald Keith King ("Petitioner") is entitled to no relief on his
motion under 28 U.S.C. § 2255 because the defect of which he complains was
capable of resolution on direct appeal and in any event has no merit. Accordingly,
this Court should either dismiss this action or grant summary judgment in favor of the
United States.[1]

---

1    The United States believes that, in light of Petitioner's failure to identify any relevant evidence
that would aid this Court in deciding the issues presented, and because the existing record
demonstrates that Petitioner is entitled to no relief, no evidentiary hearing is necessary. *See United
States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992); *United States v. Smith*, 915 F.2d 959, 964
(5th Cir. 1990) (where the court finds the record "clearly adequate to dispose fairly of the allegations,
the court need inquire no further").

## JURISDICTION

This Court has jurisdiction over both the parties and the subject matter of this action pursuant to 28 U.S.C. § 2255.

## DENIAL

The United States denies each and every allegation of fact made by Petitioner, except those supported by the record and specifically admitted herein, and demands strict proof thereof.

## STATEMENT OF THE CASE

A grand jury indicted Petitioner on October 24, 2000, charging him with three offenses in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B): (1) conspiracy to possess, with intent to distribute, powder cocaine and crack cocaine; (2) possession with intent to distribute more than 500 grams (specifically, approximately 991.8 grams) of powder cocaine; and (3) possession with intent to distribute more than 5 grams (specifically, approximately 49.3 grams) of crack cocaine. Petitioner pleaded not guilty before a United States Magistrate Judge on November 1, 2000.

On December 7, 2000, this Court denied Petitioner's motion to suppress evidence of a consent search. (Tr. 127.)[2] Based both on the facts elicited during the suppression hearing and on a stipulation of facts by the parties, this Court (sitting alone) then convicted Petitioner of only one of the three charges: possession of

---

2 "Tr." refers to the transcript of the suppression hearing and bench trial held by this Court on December 7, 2000. The number following refers to the page number.

powder cocaine with intent to distribute. (Tr. 132.)  The prosecution abandoned the other counts.

On March 2, 2001, this Court sentenced Petitioner to 97 months' confinement, to be followed by a four-year period of supervised release.  No fine was imposed, and this Court remitted the $100 special assessment upon motion by the prosecution.

Petitioner filed a direct appeal with the United States Court of Appeals for the Fifth Circuit.  That court affirmed Petitioner's conviction on December 11, 2001. *United States v. King*, No. 01-40292, 2001 U.S. App. LEXIS 28106, 31 Fed. Appx. 153 (5th Cir. Dec. 11, 2001) (unpublished decision).  On May 8, 2002, Petitioner filed the instant motion to vacate his conviction and sentence under 28 U.S.C. § 2255, accompanied by a memorandum of points and authorities ("Pet. Brief").

The United States is unaware of any other post-conviction proceedings involving Petitioner.  No evidentiary hearing has been held in this action.

## STATEMENT OF FACTS

Officer Jose Garcia of the Harlingen Police Department was conducting routine drug interdiction activities at the Harlingen bus station on October 17, 2000. (Tr. 10-11, 60.)[3]  As a narcotics investigator with the city's special investigations unit, Officer Garcia was responsible for stopping the flow of illegal narcotics at the city's transportation hubs; he had been performing drug interdiction duties at the bus station for the past year. (Tr. 10, 55.)  Officer Ramiro Martinez (a canine handler) was also

---

3  An employee of the Valley Transit Company, Juan Carlos Sanchez, testified that officers conducted such checks "once or twice a week." (Tr. 60.)

working at the bus station that afternoon. (Tr. 11, 14.) Meanwhile, two Border Patrol agents were conducting checks of their own elsewhere in the bus station. (Tr. 50.)

At about 5:30 that afternoon, Officer Garcia encountered Petitioner, who was waiting in a line of 10 to 15 people to board a bus headed north. (Tr. 11, 59.) As Officer Garcia later testified, "there was already passengers on the bus. This particular line was from a bus that had just arrived from McAllen and it was a connection bus for the bus going northbound." (Tr. 12.) The bus driver was just starting to check these passengers' tickets to allow them onto the bus. (Tr. 52.) "It was the bus station that had them in line," Officer Garcia later explained. *Id.*

Officer Garcia began speaking to people at the front of the line, identifying himself as a police officer[4] and asking passengers about their destinations; Officer Garcia would also ask for consent to search passengers' carry-on bags. (Tr. 12, 14, 41.) Petitioner was in the middle of the line; he said he was headed for Florida. (Tr. 13-14.) Officer Garcia stood off to Petitioner's side, not in front of Petitioner, and asked to see Petitioner's bus ticket. Petitioner handed it to him - the ticket bore the name "James Duane" and showed that the passenger was headed to Jacksonville, Florida. (Tr. 14, 16.) Officer Garcia asked Petitioner the same types of questions he had asked everyone else in the line. (Tr. 15.) Petitioner was carrying a backpack on his right shoulder and a duffle bag in his left hand; Officer Garcia asked if Petitioner was carrying anything illegal in these bags. *Id.* Petitioner said "no." (Tr. 16.)

---

4 Officer Garcia was in plain clothes, but had his badge hanging in clear view from a chain around his neck. (Tr. 12-13.) Officer Garcia was armed, but his weapon was out of view, concealed under his clothes. (Tr. 14.)

4

Officer Garcia then asked Petitioner if he could check Petitioner's bags. (Tr. 16.) Petitioner asked "if it was necessary." *Id.* Officer Garcia replied that "it was not necessary." (Tr. 17.) "I told him that we tried to ask everyone with carry-on luggage if we can check their bags, after I told him that it was not necessary." (Tr. 17, 38.) Officer Garcia then asked Petitioner for consent again, since Petitioner hadn't answered the question the first time. *Id.* Petitioner nodded his head in assent and put his bags down in front of Officer Garcia and took a step backwards. (Tr. 17, 18, 19.) Juan Carlos Sanchez, an employee of the Valley Transit Company, was standing nearby at that time - he later confirmed Officer Garcia's recollection of events by testifying that he heard Petitioner say "okay," while nodding his head, when asked for consent. (Tr. 64.)

Officer Garcia looked inside the backpack, and found nothing unusual. (Tr. 19.) Then he began to look into Petitioner's duffel bag. Before he could feel any hard objects inside the duffel bag, Officer Garcia felt a bump on his right forearm - it was Officer Martinez's canine alerting to and lunging at the duffle bag. (Tr. 20, 45.) As Officer Martinez testified, the dog had pulled Officer Martinez in the direction of the duffel bag. (Tr. 115.) This was unusual because, as Officer Garcia later recalled, "we usually don't run the dogs near the passengers, so I was surprised that he lunged forward that way." (Tr. 20.)

The dog tried to put his head into the duffel bag, but Officer Martinez pulled the dog away. (Tr. 21-22.) Officer Garcia continued to feel around inside the duffel bag and found "a hard round object." Officer Garcia pulled the object out - it was

5

"some type of can wrapped in a blue cloth" weighing about half a pound. (Tr. 22.) He tried to look for a lid to open the can (which had been painted black very recently), but it was sealed. (Tr. 22-23.)

Officer Garcia asked Petitioner what was in the can - Petitioner replied that "there was some toys in the can for his kids." (Tr. 23, 65.) Officer Garcia then asked whether there were any more cans in the duffle bag. Although Petitioner said there were no more, Officer Garcia found another can. *Id.* Officer Garcia again asked Petitioner what was in the cans - Petitioner said there was nothing in the cans. (Tr. 23-24.)

Officer Garcia described what happened next:

> Well, I tell him that I can feel something in the can and I asked him, what is in the can, and I believe the third time he says that they're some type of blocks. And I asked him what kind of blocks and he said that they are some type of levelling blocks to level objects. He then says – or then I asked him if he always seals levelling blocks in cans when he's traveling and he says yes. At that point I'm looking for my partner, Officer Martinez so that he can ... use the dog to sniff the cans.

(Tr. 24.) Officer Garcia then asked for permission to open the cans, but Petitioner replied that "it wasn't necessary or something to that effect." (Tr. 25.) Officer Garcia put down the cans and asked to see Petitioner's identification; he noticed immediately that Petitioner's identification (which bore his real name) did not match the name on the bus ticket. *Id.*

By this time, Officer Garcia had spotted Officer Martinez,[5] and had him bring the dog to the cans. (Tr. 26.) The dog alerted to the cans. (Tr. 26, 81-82.) Officer

---

5 The two officers were busy patrolling an area about 50 to 60 feet wide. (Tr. 26.)

Martinez asked Petitioner for consent to open the cans - Petitioner refused. (Tr. 27.) At this point, "Officer Martinez told [Petitioner] that he was going to be detained while we attempt to obtain a search warrant for the cans." *Id.* The officers then obtained a warrant, opened the cans (with some difficulty), and found cocaine inside. (Tr. 28, 30, 117.)

Petitioner testified at the suppression hearing. He denied giving consent to search his bags, and denied nodding his head affirmatively in response to Officer Garcia's request for consent. (Tr. 89, 93.) On cross-examination, Petitioner admitted that he had a high school diploma and some college credit. (Tr. 98-99.) He had also worked as a tennis instructor and a warehouseman in Florida. (Tr. 99.) He understood English, and understood what the officers had been saying. (Tr. 99-100.) Petitioner also admitted that no one had physically threatened him. (Tr. 100.)

During argument, both counsel couched their arguments in relation to the relevant case law standard for determining voluntariness of consent to search. *See* Tr. 121-22, 124-25. Trial defense counsel specifically referred to the six-part test for voluntariness of consent. (Tr. 124.)

This Court ruled as follows:

> ... I see corroboration ... on every issue, including the consent which is corroborated by a person who has absolutely no connection with law enforcement other than being present at the time and place where law enforcement routinely works. But, you know, he was not shown to have any affiliation, either socially or professionally, with law enforcement and so, therefore, the corroboration by the civilian witness of the consent by the Defendant is, I guess – I mean, what I'm saying is that the officer's testimony, Officer Garcia's testimony that the Defendant gave consent by nodding his head and – but not recalling specifically what words he articulated in suppressing consent was again

7

corroborated by the civilian who has no connection with the law enforcement officer.

The fact that when you refer to *the totality of the circumstances in determining consent* and – to me, any detention that ... was experienced by the Defendant was not due to any actions of law enforcement. It was more to do with the actions of the bus company in waiting to have the other passengers loaded or present tickets and maybe getting the luggage on board or whatever, but he was never detained by law enforcement officers at the time that this encounter took place.

The fact that there was two police officers ... during part of the event was not coercive. There was only one police officer present at all times and the canine officer came and went on several occasions and, in fact, the Defendant's own evidence corroborates the testimony of the Government's witness Jose Garcia in his testimony that the canine went for Mr. King's bag and that he had to pull the dog back because ... he wanted to protect the police officer Garcia. So again, you know, that's what the Government's witness testified to. The Defendant's own evidence in the form of a live witness, Martinez, and his exhibit, Defendant's Exhibit No. 4,[6] corroborates the Government's evidence and so The Court finds that consent was given for the search of the bag before the search [warrant] was obtained for the cans and for that reason the Motion to Suppress is denied.

(Tr. 125-27) (emphasis added).

Further facts necessary to the disposition of this case are set forth in argument below.

## ISSUES PRESENTED

1. Whether Petitioner has procedurally defaulted, by failing to raise this issue in a direct appeal?

2. Whether Petitioner's appellate defense counsel was constitutionally ineffective for failing to raise the suppression issue in Petitioner's direct appeal?

---

6 Defense Exhibit 4 was Officer Martinez's affidavit in support of the search warrant. *See* Tr. 112.

## SUMMARY OF ARGUMENT

This Court correctly denied Petitioner's motion to suppress. Petitioner failed to raise the suppression issue in his direct appeal, however, so he has procedurally defaulted, waiving any right to collateral review of the suppression issue presented here. Because of this Court's correct decision on the suppression motion, Petitioner cannot demonstrate the requisite cause and prejudice to excuse his failure to raise the issue on direct appeal. Appellate defense counsel was not constitutionally ineffective for failing to raise this issue, because this Court correctly denied the suppression motion. Appellate defense counsel correctly recognized that appealing the suppression issue would have been fruitless, if not frivolous. Thus, this Court should therefore dismiss Petitioner's action or grant summary judgment for the United States.

## ARGUMENT

Petitioner claims that this Court erred in denying his suppression motion. (Pet. Brief 5-11.) He asserts that this Court applied an incorrect standard of law, and reached an incorrect result. *Id.* Petitioner urges this Court to "vacate his conviction and remand for new trial or whatever relief this court deems appropriate." (Pet. Brief 16.)

"A section 2255 movant who fails to raise a constitutional or jurisdictional issue on direct appeal waives the issue for a collateral attack on his conviction, unless there is cause for the default and prejudice as a result." *United States v. Kallestad*, 236 F.3d 225, 227 (5th Cir. 2000). Petitioner never raised the suppression issue in his direct appeal. Thus, he can obtain review under section 2255 only if he can

demonstrate cause and prejudice for his failure to raise the issue. *United States v. Cervantes*, 132 F.3d 1106, 1109 (5th Cir. 1998); *see also Bousley v. United States*, 523 U.S. 614, 621-22 (1998).

The United States contends that Petitioner has failed to demonstrate the requisite "cause and prejudice." To understand why this is so, the United States first demonstrates that Petitioner's suppression issue fails on the merits.

### *1. This Court did not err in denying Petitioner's suppression motion.*

This Court assesses the totality of the circumstances in deciding the factual question of whether a defendant has voluntarily consented to a search. *United States v. Morales*, 171 F.3d 978, 982 (5th Cir. 1999). In considering the totality of the circumstances, this Court applies a six-factor test, including: (1) the voluntariness of the defendant's custodial status; (2) the presence of any coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *Id.* at 982-83; *see also United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000). No single factor is dispositive. *United States v. Olivier-Becerril*, 861 F.2d 424, 426 (5th Cir. 1988).

This Court correctly analyzed the facts in the record in determining that Petitioner voluntarily consented to the search.[7] Consistent with the test discussed in *Morales*, this Court observed that Petitioner had not been detained by the police - they simply approached him while he was in line to board the bus. (Tr. 126.) This finding is supported by the testimony of Officer Garcia, who stated that he approached Petitioner while Petitioner was waiting in line to board the bus. (Tr. 11, 12, 59.) The police had not caused the line to form - the line of people had just arrived from McAllen; these people were waiting to board a connecting bus headed north, and the bus driver was just beginning to check the passengers' tickets. (Tr. 12, 52.) Juan Sanchez, the VTC employee, testified that passengers show their tickets to the bus driver outside the bus before being permitted to board. (Tr. 62.) Quite simply, as Officer Garcia testified, "[i]t was the bus station that had them in line." (Tr. 52.) The first prong of the voluntariness test thus weighs in favor of the prosecution.

No coercive police procedures were used. Petitioner admitted that he had not been threatened by the police, *see* Tr. 100, and did not allege any coercion other than the fact that there were two police officers present. (Tr. 124.) As this Court noted, the mere presence of two police officers did not transform an otherwise consensual environment into a coercive one. (Tr. 126.) In any event, as this Court also noted,

---

7 Contrary to Petitioner's argument, *see* Pet. Brief 14, this Court applied the correct legal standard in deciding the suppression issue. *See, e.g.*, Tr. 126 (referring to the "totality of the circumstances"). This Court's reference to the appropriate legal standard indicates that it applied the correct test. *See Walton v. Arizona*, 497 U.S. 639, 653 (1990) (district judges are "presumed to know the law and to apply it in making their decisions").

11

Officer Garcia obtained Petitioner's consent to search the bags outside the presence of the other officer. (Tr. 17, 18, 63, 65.) Moreover, Petitioner himself testified that the dog handler was not immediately behind him, but was instead "more towards the opening, the entrance of the bus station where the bus is pulling into." (Tr. 105.) The second prong of the voluntariness test thus favors the prosecution as well.

Nor does the third prong, cooperation with authorities, favor Petitioner. The evidence indicates that Petitioner nodded his head affirmatively when asked for consent, and that he stepped back away from his bags. (Tr. 17, 18, 19, 64.) Moreover, once Officer Garcia began to look through the duffel bag, Petitioner made no attempt to state that he had not consented. By contrast, when asked for consent to search the cans, Petitioner expressly declined. (Tr. 27.) Petitioner's level of cooperation with the police does not favor his argument that his consent was not voluntarily obtained.

Petitioner was undoubtedly aware of his right to refuse consent. He specifically asked Officer Garcia whether it was necessary to search his bags, and Officer Garcia replied "that it was not necessary." (Tr. 17.) "I told him that we tried to ask everyone with carry-on luggage if we can check their bags, after I told him that it was not necessary." *Id.* The fourth factor of the voluntariness test therefore favors the prosecution.

Fifth, Petitioner was well-educated. He had completed his high school education, as well as some college courses, and spoke English fluently. (Tr. 98-100.)

This factor does not favor Petitioner; to the contrary, it adds credence to the view that Petitioner knowingly and voluntarily consented to the search of his bags.

Finally, the sixth voluntariness factor tilts towards the prosecution's view that Petitioner's consent was voluntary. The cocaine was contained in sealed and wrapped cans, buried within a packed duffel bag. Petitioner consented to the search of the bags before the dog alerted, and thus this Court could reasonably conclude that Petitioner felt secure that his illicit activity would not be discovered.

Ultimately, the crux of this issue is a pure question of credibility: this Court was tasked with deciding whether Petitioner freely gave his consent for Officer Garcia to search his bags. Officer Garcia testified that Petitioner did give such consent, *see* Tr. 17, 18, and the VTC employee confirmed Officer Garcia's version of events. *See* Tr. 64. On the other hand, Petitioner claimed that he had not nodded his head, nor had he given any other manifestation of consent. (Tr. 89, 93.) This Court, aware of the proper test to apply, found Officer Garcia's corroborated testimony more credible, and ruled that Petitioner had consented. (Tr. 125-27.)[8] The evidence in the record supports this Court's decision.

---

8  The issue here is not, as Petitioner claims (*see* Pet. Brief 8-9), who was responsible for the existence of the line of people waiting to board the bus. For the record, however, it should again be noted that Petitioner never alleged that the police were in fact responsible for any delay in passengers' boarding the bus - in fact, he specifically admitted that he "had no idea why the [bus'] door was still closed." (Tr. 103.) Moreover, as Juan Carlos Sanchez of VTC testified, passengers commonly waited outside buses' doors for the driver to check their tickets; Officer Garcia testified that the bus driver in this case had just begun checking tickets. (Tr. 52, 62.) The existence of a line of passengers was not the result of police tactics - rather, it was the normal course of business at the bus station.

***2. This Court should dismiss the action, because Petitioner has failed
to demonstrate cause or prejudice for his failure to raise the
suppression issue in his direct appeal.***

As noted above, the suppression issue claim was not raised in Petitioner's
direct appeal. "A section 2255 movant who fails to raise a constitutional or
jurisdictional issue on direct appeal waives the issue for a collateral attack on his
conviction, unless there is cause for the default and prejudice as a result." *Kallestad*,
236 F.3d at 227; *see also Bousley*, 523 U.S. at 621-22.

The only cause suggested in Petitioner's pleading to explain his failure to raise
this issue in his direct appeal is the supposedly ineffective assistance of his appellate
defense counsel. Petitioner correctly notes that his appellate defense counsel refused
to raise the suppression issue on appeal; counsel stated that any appeal of the issue
would be "frivolous." Letter, Renata M. Gowie, Esq. to Petitioner, Sept. 27, 2001,
at p. 1 (attached to Petitioner's Brief).

Meritorious claims of ineffective assistance of counsel satisfy *Bousley*'s cause
and prejudice requirement, and thus excuse a failure to raise an issue on direct appeal.
*United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996). To prevail on such a claim,
however, Petitioner bears the burden to establish both prongs of the test set forth in
*Strickland v. Washington*, 466 U.S. 668 (1984). Petitioner must first show that
counsel committed errors so serious that she was not functioning as "counsel" at all,
within the meaning of the Sixth Amendment. *Strickland*, 486 U.S. at 687. Counsel's
performance must be shown to have fallen below an objective standard of
reasonableness, as measured by prevailing professional norms. *Strickland*, 466 U.S.

14

at 687-88. Second, Petitioner must demonstrate that he was prejudiced by that deficiency. *Strickland*, 466 U.S. at 691-92. Failure to satisfy either prong of this test is fatal to a claim of ineffective assistance. *Strickland*, 466 U.S. at 700.

Counsel is presumed to have acted competently. Indeed, there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance or sound trial strategy. *Strickland*, 466 U.S. at 689. Once Petitioner identifies the acts or omissions of counsel that allegedly fall outside the bounds of reasonable professional judgment, this Court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance. *Id.* at 690; *see also Livingston v. Johnson*, 107 F.3d 297, 305 (5th Cir.), *cert. denied*, 522 U.S. 880 (1997).

Considering this strong presumption of competence, this Court should determine that Petitioner's appellate defense counsel did not perform deficiently, in the constitutional sense. No ineffective assistance of counsel can result from a failure to appeal a meritless issue. *See Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990) (counsel is not deficient for, and prejudice does not issue from, the failure to raise a legally meritless claim); *see also United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994) (same). Petitioner must demonstrate, pursuant to *Strickland*, that his counsel "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). In this case, as noted above, this Court correctly decided the suppression issue, so an appeal of that issue would assuredly have been unsuccessful; certainly, this Court's decision, firmly-based as it

15

was on facts in the record, was not "clearly erroneous." *See United States v. Slanina,* 283 F.3d 670, 680 (5th Cir. 2002) (describing the standard of review on appeal). Thus, Petitioner has failed to meet *Strickland*'s deficiency prong, and thus cannot demonstrate the required "cause and prejudice" to excuse his procedural default.

Nor can Petitioner satisfy the prejudice prong of *Strickland,* for he cannot demonstrate that, had his appellate counsel only raised the issue, Petitioner would have prevailed in an appeal of the suppression matter. *See Smith v. Robbins,* 528 U.S. at 285-86; *see Briseno v. Cockrell,* 274 F.3d 204, 207 (5th Cir. 2001). In any direct appeal, Petitioner would have had to demonstrate not merely error, but "clear error" in this Court's resolution of the factual issue of consent. *Slanina,* 283 F.3d at 680. As this Court's determination of the suppression issue was correct, *see* Argument section 1, above, this Court should thus determine that Petitioner has also failed to meet the prejudice standard of *Strickland,* and should find that Petitioner therefore has failed to demonstrate "cause and prejudice" for his procedural default in failing to raise the suppression issue in his direct appeal.[9]

Nevertheless, even if he did not demonstrate cause and prejudice for failing to raise this issue in a direct appeal or at trial, Petitioner could nonetheless secure review

---

9 Petitioner briefly argues that his appellate defense counsel also failed to raise an issue regarding the defense's stipulation to the facts admissible against Petitioner once the suppression motion had been lost. (Pet. Brief 12.) Petitioner's argument is off-base. First, by litigating the suppression motion, trial defense counsel had adequately preserved the suppression issue for a possible appeal - Petitioner was therefore not prejudiced by the subsequent stipulation, nor was there anything professionally unreasonable about trial defense counsel's action. It should be noted that Petitioner expressly agreed in open court to the stipulation and the waiver of jury trial. (Tr. 128.) Finally, and most importantly, trial defense counsel asked this Court during the subsequent bench trial to "take all of the hearing into consideration," necessarily including the defense's version of events. (Tr. 130.) This Court agreed to do so. *Id.*

under section 2255 pursuant to a narrow exception if "the error of a constitutional nature would result in a complete miscarriage of justice." *United States v. Lopez*, 248 F.3d 427, 433 (5th Cir.), *cert. denied*, __ U.S. __, 122 S. Ct. 222 (2001); *see Bousley v. United States, supra.*, 523 U.S. at 620-21 (outlining such a miscarriage of justice where, for example, a defendant was convicted of an act that the law does not make criminal). Here, there is no miscarriage of justice, considering the overwhelming evidence of Petitioner's guilt and the admissibility of the evidence against him. *See* Argument section 1, above.

Accordingly, Petitioner's action is procedurally barred - this Court should dismiss it or, in the alternative, grant summary judgment for the United States.

## CONCLUSION

This Court should dismiss Petitioner's action or, in the alternative, should grant summary judgment for the United States in this action.

Respectfully submitted,

MICHAEL T. SHELBY
United States Attorney

JAMES L. TURNER
Assistant United States Attorney

By: _____

MITCHEL NEUROCK
Assistant United States Attorney
1100 Matamoros Street, Suite 200
P.O. Box 1179
Laredo, Texas 78042-1179
(956) 723-6523
(956) 726-2266 (fax)
Fed. I.D. 31513
TX St. BAR No. #784672

17

# CERTIFICATE OF SERVICE

I hereby certify that a copy of this Government's Answer to Section 2255 Motion, Motion to Dismiss, Motion for Summary Judgment, and Brief was served via certified U.S. Mail on June 5, 2002 upon Petitioner, at the following address:

Donald Keith King
Reg. No. 94445-079
Federal Correctional Complex, Coleman-Medium
P.O. Box 1032
Coleman, Florida 33521

MITCHEL NEUROCK
Assistant United States Attorney

18